IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2018


**ANGELA M. GREENE v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for McMinn County**
No. 15-CR-316    Sandra Donaghy, Judge

_____

**No. E2017-02257-CCA-R3-PC**

_____


The Petitioner, Angela Greene, filed a post-conviction petition, seeking relief from her convictions of first degree murder in the perpetration of a theft, aggravated assault, and theft of property valued at $1,000 or more but less than $10,000 and the accompanying life sentence.  The Petitioner raised numerous allegations of ineffective assistance of trial counsel, including insufficient trial preparation, failure to request a continuance when co-counsel became ill, failure to raise objections during trial, failure to ask the Petitioner on direct examination whether she killed the victim, and a conflict of interest due to his prior representation of a State's witness.  Following the post-conviction court's denial of relief, the Petitioner appeals.  Upon review, we affirm the judgment of the post-conviction court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Donald (Trey) Winder, III, Athens, Tennessee, for the Appellant, Angela M. Greene.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Clay Collins, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**


**I.  Factual Background**


        The Petitioner's convictions stemmed from the circumstances surrounding the death of the seventy-year-old victim, Robert Gravely, following an assault and the theft

of his vehicle. State v. Angela M. Greene, No. E2013-00475-CCA-R3-CD, 2014 WL 3384661, at *1, 11 (Tenn. Crim. App. at Knoxville, July 10, 2014). The proof at trial revealed that at the time of the victim's death, the Petitioner had been living with him sporadically for approximately one year. Id. at *1, 13. On more than one occasion prior to his death, the victim had reported to the police that the Petitioner had taken his car; however, he withdrew the complaints after the car was returned. Id. at *1. On the morning of Sunday, November 9, 2009, the victim was found lying in his front yard. Id. He was cold, bruised, and bloody and was taken to the hospital for treatment. Id. at *1-2. In the front yard, the police saw signs that an altercation had occurred, including a broken concrete bench. Id. The Petitioner and her boyfriend, co-defendant Ricky Bryson, had called 911 about the victim, and they were at the scene when the police arrived. Id. at *2. The Petitioner and Bryson had blood on their clothes, Bryson had blood on his hands, and they told the police that they had tried to help the victim. Id. While at the scene, the police noticed a large dent in the hood of the victim's car. Id. at *2, 3. Because the car could be evidence relating to the crime, the police informed the Petitioner that she could not take the car. Id. at *3. The Petitioner, who had been driving the car earlier that morning, appeared angry, then she and Bryson walked away from the scene. Id. at *3, 11.

While in the hospital, the victim initially was reluctant to give a statement about the incident. Id. at *3. However, when he realized he was dying, he gave a statement reflecting that the Petitioner and Bryson wanted to take the victim's car on Friday or Saturday evening; the victim thought they wanted to get drugs. Id. at *4, 6, 7. The victim further stated that when he refused to let them have the car, they beat him; the beating began inside the house and ended outside in the front yard. Id. at *4, 6. The victim said that during the altercation, Bryson poured something from a jar onto the victim. Id. at *16. The victim said that the Petitioner and Bryson took the victim's car keys and left in his car. Id. at *4, 16. The victim said that he was unable to get up and remained outside until he was found on Sunday morning. Id. at *4. The victim was hospitalized for thirty-three days before he died from his injuries. Id. at *6. Two of the State's witnesses, Cynthia Lewis and Brandi Stiles, testified that the Petitioner made statements incriminating herself in the attack on the victim. Id. at *14, 28-29.

The State medical examiner testified that the victim died as a result of "sepsis, cold exposure, and assault" and that the victim's death was a homicide. Id. at *12. She determined that the victim's injuries "were consistent with blunt force trauma and frostbite." Id. The medical examiner "thought she reviewed a video recorded statement from the victim, but she was unsure." Id. at *13.

The Petitioner testified that she took care of the victim and often drove his car with his permission, usually to run errands for the victim. Id. at *18. On Friday night before the victim was found in his front yard, the Petitioner woke with a headache, left

the victim's house, went to her mother's house to get medicine, and met Bryson at her mother's house. Id. at \*18-19. The Petitioner and Bryson were together from Friday night until Sunday morning. Id. at \*18-20. On Saturday, the Petitioner spoke with the victim a couple of times by telephone; their last conversation occurred sometime after noon. Id. at \*19. On Sunday morning, the Petitioner became concerned after the victim repeatedly failed to answer her calls. Id. at \*21. The Petitioner and Bryson returned to the victim's house and found the victim lying unconscious on the ground in the front yard. Id. The Petitioner called 911. Id.

The Petitioner maintained that she had been upset at the scene because she was cold, had to sit in a car for forty-five minutes, was treated like a criminal, and had to walk home. Id. The Petitioner denied making incriminating statements to anyone. Id. at \*22, 24. She also denied that she harmed the victim or that Bryson poured anything from a jar onto the victim. Id. at \*24.

The defense's expert witness, Dr. Ronald Wright, disputed the findings of the State's medical examiner, stating that the victim's injuries were most likely the result of hypothermia and that hypothermia was the primary cause of the victim's death. Id. at \*25. Dr. Wright acknowledged that some of the victim's injuries could have been caused by blunt force trauma. Id. Dr. Wright concluded that the victim's manner of death was "undetermined because it could have been homicide, accidental, or natural disease." Id.

A jury convicted the Petitioner of felony murder, aggravated assault, and theft of property more than $1,000 but less than $10,000. Id. at \*30. The trial court sentenced the Petitioner to life for the felony murder conviction, six years for the aggravated assault conviction, and four years for the theft conviction. Id. at \*1. The trial court ordered that the sentences for aggravated assault and theft be served consecutively to each other but concurrently with the life sentence for felony murder. Id. On direct appeal, this court affirmed the Petitioner's convictions and sentences. Id.

Thereafter, the Petitioner filed for post-conviction relief, alleging that her trial counsel was ineffective. In pertinent part, she contended that trial counsel failed to have sufficient meetings with her; failed to call the Petitioner's sister to testify regarding Lewis' reluctance to testify; failed to prepare the Petitioner to testify and made the decision for the Petitioner to testify at the last minute; failed to specifically ask the Petitioner on direct examination whether she killed the victim; and failed to confront the medical examiner about her claim that she watched a video recording of the victim's statement when the recording did not exist. The Petitioner also contended that trial counsel had a conflict of interest because he previously represented some of the State's witnesses.

At the post-conviction hearing, the Petitioner testified that a public defender was appointed to represent her on the day of her arraignment. The next time she saw her attorney, he waived her preliminary hearing, and her case was bound over to the grand jury. The Petitioner stated that her attorney told her that the police had a video recording of an "exchange" with the victim and that it would be presented to the grand jury; therefore, a preliminary hearing had not been necessary. The Petitioner said that her attorney was removed from her case due to a conflict of interest; thereafter, trial counsel and co-counsel began representing her. The Petitioner said that she learned at trial that the police did not have a video recording of the victim's statement.

The Petitioner stated that she was arrested in 2009 and that she remained in custody until her trial in 2012. While she was in custody, she met with trial counsel four or five times and once with co-counsel. Each meeting lasted approximately one hour or one and one-half hours. During the meetings, trial counsel and the Petitioner discussed trial strategy. Trial counsel told the Petitioner that he thought securing a conviction of a lesser offense "would be a win." The Petitioner told him that she disagreed and thought the only "win" would be an acquittal because she was innocent. The Petitioner recalled that the State offered to allow her to plead guilty to aggravated assault in exchange for the dismissal of all other charges against her. The Petitioner refused the plea offer, maintaining that she was innocent.

The Petitioner said that prior to trial, the State provided the defense with a list of prospective witnesses, which included Wendy Millsaps, Cynthia Lewis, and Brandi Stiles. Trial counsel told the Petitioner that he had represented Millsaps. The Petitioner thought trial counsel had also represented Lewis, and she knew that Stiles was facing some misdemeanor charges. The Petitioner asked trial counsel about representing all three women, and trial counsel responded that he did not have a conflict that would negatively impact his representation of the Petitioner.

The Petitioner recalled that Lewis testified against her at trial. The Petitioner said that her sister knew Lewis "from the streets." During trial, Lewis approached the Petitioner's sister in the court hallway and asked her to convey her apologies to the Petitioner. Lewis explained to the Petitioner's sister that she was told she would have to serve "[her] time" if she did not testify against the Petitioner. The Petitioner's sister told counsel and the Petitioner about her exchange with Lewis. The Petitioner said that she and her sister encouraged counsel to call the sister to testify regarding Lewis' remarks; however, counsel did not think Lewis' comments would have any impact on the Petitioner's trial. Trial counsel was not concerned about Lewis' testimony; nonetheless, on cross-examination, he asked if anyone had threatened to make her serve her sentence if she did not testify against the Petitioner. Lewis denied that she was coerced.

- 4 -

The Petitioner stated that prior to trial, she and counsel had brief discussions about whether she should testify. Trial counsel hesitated to have the Petitioner testify because he anticipated that she would be "attacked" by the State on cross-examination. Trial counsel said that he would prepare the Petitioner to testify by asking her sample direct examination and cross-examination questions; however, such preparations never occurred. The Petitioner said that the final decision regarding whether she would testify was made immediately prior to her testimony. Counsel advised her that she needed to testify so the jury could see her concern for the victim. The Petitioner acknowledged that she chose to testify but maintained that she did not feel prepared to testify. The Petitioner said that she and counsel did not discuss her defense strategy or how her testimony would further that strategy.

The Petitioner said that her trial testimony lasted approximately two days. Trial counsel asked the Petitioner 414 questions during direct examination but never directly asked if she killed the victim. The Petitioner acknowledged that on direct examination, trial counsel asked if she had poured a chemical substance on the victim, if she had a scuffle with the victim at a concrete bench, if she had thrown an orange soda at the victim, if she had ever been physical with the victim, or if she had ever threatened the victim with harm and that she denied each allegation. Nevertheless, she opined that the jury never heard her declare her innocence.

The Petitioner stated that trial counsel did not make any objections during the State's lengthy cross-examination of her even though the trial court asked trial counsel on several occasions if he wanted to object. Additionally, the Petitioner recalled that on one occasion co-counsel told trial counsel that he should have raised an objection, but trial counsel said "it was harmless."

The Petitioner said that the victim had a "bookie." The bookie collected cash for bets from the victim's mailbox and left any winnings inside the victim's mailbox. The Petitioner told trial counsel that the victim could have been attacked by someone trying to get cash from the victim or his mailbox. However, trial counsel dismissed that theory and did not investigate it.

The Petitioner acknowledged that she may not have been aware of all of counsel's trial preparations. The Petitioner said that co-counsel became sick during trial, was hospitalized, and was unable to continue representing the Petitioner at trial. Trial counsel did not request a continuance or indicate whether he would make any adjustments to the trial strategy based upon the absence of co-counsel. The Petitioner told trial counsel that she was concerned that he had too much "on his plate" to continue representing her without co-counsel. She thought that trial counsel agreed with her assessment but that he did not want to admit being unable to do his job alone. The Petitioner acknowledged that she did not know how involved co-counsel was in the preparation of her defense.

The Petitioner testified that during trial, the State adduced proof that the victim's answering machine contained numerous messages, several of which were left by the Petitioner in the two-day period before the victim was discovered in his front yard. At trial, the State played some, but not all, of the Petitioner's messages and asked her about those messages. During her trial testimony, the Petitioner mentioned other messages she had left for the victim, noting that she had checked on the victim's welfare and sang nursery rhymes to him. The Petitioner asked trial counsel to play all of the messages she had left for the victim but did not recall trial counsel responding to her request.

The Petitioner said that at trial, the State emphasized that the Petitioner became upset when the police would not allow her to leave with the victim's car. She wanted to counter the State's allegations that she was "a money grubber" who only wanted the victim's car and made her "look like a real bad girl, a real bad one." At the post-conviction hearing, the Petitioner asserted that she had been the victim's friend and caretaker for three years, that she was upset because she had found the victim lying on the ground, and that the victim's car was her only means of transportation to visit the victim at the hospital. The Petitioner thought the jury should have heard her explanation of why she was upset the police made her leave the scene without the victim's car.

The Petitioner said that Bryson's trial occurred several months after hers and that she did not know whether trial counsel attended Bryson's trial. At his trial, Bryson was found not guilty. Afterward, trial counsel sent the Petitioner a letter stating that Bryson's acquittal signaled that "surely there was something that we could do to get [her] another trial." In another letter, trial counsel said that the victim had never identified Bryson as one of his attackers, which was incorrect. The Petitioner thought the victim had accused both of them and that the State's theory was the same in both trials. Trial counsel never told the Petitioner that the medical examiner's testimony at Bryson's trial was not consistent with her testimony at the Petitioner's trial, and trial counsel did not raise an issue about the inconsistencies in the Petitioner's motion for new trial or on appeal.

The Petitioner said that the victim was elderly and suffered from health issues. Although his condition was "hinted at" during trial, the Petitioner thought trial counsel should have provided more information to the jury about the victim's breathing problems, which could explain his failure to get up and go inside his house. The Petitioner acknowledged that trial counsel had subpoenaed the victim's medical records but asserted that trial counsel did not use the records at trial. The Petitioner recalled that the victim had been hospitalized for two or three weeks and had been released only one week before he was found in his front yard. She did not know the reason he was hospitalized and noted that he was "very weak" when he came home. She told trial counsel that the bruises on the victim's stomach were caused by shots he had been given in the hospital, not from blunt force trauma. Trial counsel did not bring up the issue at trial.

- 6 -

The Petitioner said that trial counsel repeatedly told her that they "were not prepared to go to trial" and that he "insinuated" they had not spent sufficient time together due to his caseload. The Petitioner said that she did not feel prepared for trial, especially after counsel failed to prepare her to testify. The Petitioner believed counsel's failure to prepare her to testify had a detrimental effect on her case.

On cross-examination, the Petitioner said she had a total of five or six meetings with trial counsel; during the meetings, they discussed her case, he advised her that she might need to testify, and he cautioned that the State's cross-examination would be difficult. The Petitioner acknowledged that she had wanted to testify but said that she needed to be prepared for her testimony. She conceded that trial counsel had not acted unreasonably by waiting until the conclusion of the State's proof to require the Petitioner to decide whether to testify. The Petitioner said that she was not able to tell her story or convey her innocence to the jury during direct examination.

The Petitioner acknowledged that during direct examination, she denied that she physically assaulted the victim, scuffled with the victim, threatened the victim, or was in the victim's yard prior to discovering the victim. The Petitioner acknowledged that trial counsel did not need to ask additional questions after she denied "every single thing leading up to [the victim's] death." She did not know of any objections trial counsel could have made that would have changed the outcome of trial. The Petitioner stated that trial counsel should have played all of the messages she left for the victim to show the jury that she cared for him "like . . . a child" and would not have harmed him. The Petitioner said the last thing she told the victim was that she would see him at the hospital.

The Petitioner acknowledged that Dr. Wright testified as an expert in her defense and that he must have examined the victim's medical records prior to testifying. She did not recall whether Dr. Wright testified that the victim had kidney or lung disease but did recall Dr. Wright's testimony that the victim had brain and heart disease. She recalled that Dr. Wright testified that the bruising on the victim was caused by hypothermia, not by an assault. The Petitioner acknowledged that evidence that the victim received shots in his abdomen probably would not have changed anything about her trial. The Petitioner acknowledged that Dr. Wright testified that the victim's injuries were not caused by any assault and that he presented all of the medical proof she wanted presented at trial. She further acknowledged that she would not have changed anything from a "medical perspective."

On redirect examination, the Petitioner said that she did not think the jury's verdict was based on any one issue but that all of the issues had a cumulative effect on the "overall defense." She maintained that she did not get the defense she wanted and that

she wanted to tell the jury that she was not guilty "of any of the crimes." Her concerns about trial counsel's failure to raise objections made her concerned about his "overall preparedness" for trial, maintaining that trial counsel "pretty much" let the State "do what they wanted to do."

Trial counsel said that he and co-counsel[1] met with the Petitioner "numerous" times. Trial counsel had a "fine" relationship with the Petitioner and "found her to be at least of average intelligence." Trial counsel said the Petitioner never deviated from her version of events. Initially, co-counsel was to be lead counsel; however, co-counsel had no prior experience trying a murder case so trial counsel decided to take the lead and have co-counsel assist him.

Trial counsel testified that before the victim's death, the Petitioner was charged with aggravated assault. Trial counsel advised the Petitioner that the State made an offer wherein the Petitioner would plead guilty to aggravated assault and receive a six-year sentence. Trial counsel further advised the Petitioner that he did not think she should accept the offer, even though the State warned the charge would be increased to homicide if the victim died.

Trial counsel said that while the victim was hospitalized, the prosecutor asked the police to record a statement from the victim because the victim was very ill and was expected to die. The police took the statement, but the recording was not made due to technical difficulties. Several weeks later, the victim died, and the Petitioner was charged with felony murder in a superseding indictment.

Trial counsel said that on at least two occasions, the victim had pressed charges against the Petitioner for taking his vehicle. One or two of the charges were dismissed, but the Petitioner pled guilty to one charge in general sessions court. Because of the prior charges, the Petitioner was immediately a suspect in the victim's murder.

Trial counsel said the case against the Petitioner was based on circumstantial evidence. The Petitioner maintained that she was the victim's caretaker, while the State's witnesses alleged that the Petitioner was manipulating the victim and using him for his money and his vehicle. Trial counsel recalled that the victim had health problems, and he subpoeanaed the victim's medical records. After reviewing the records, trial counsel hired Dr. Wright as a forensic specialist.

Regarding the Petitioner's claim that trial counsel had represented Stiles, Greene, and Millsaps, trial counsel said that he did not recall ever personally representing Stiles, but he knew from her criminal background that she had no significant convictions that

---

[1] Co-counsel was deceased at the time of the post-conviction hearing.

could be used to impeach her testimony. Trial counsel did not recall the public defender's office representing Lewis while the Petitioner's case was pending or while the trial was ongoing. Trial counsel acknowledged that a "significant period of time" before the Petitioner was charged, he had represented Millsaps, and her case was resolved by a plea agreement. Trial counsel and the Petitioner discussed whether his prior representation created a conflict of interest. Trial counsel thought that any potential conflict would have been with Millsaps and him, not with the Petitioner and him. Trial counsel stated that Millsaps' testimony did not hurt the Petitioner's defense and that he was not concerned about her testimony; instead, he was concerned about the testimony of witnesses who testified that the Petitioner made incriminating statements.

Trial counsel recalled that the Petitioner wanted him to question Lewis as to whether she was testifying for the State to avoid serving three years for a probation violation. Trial counsel thought he cross-examined Lewis on that issue.

Trial counsel stated that the defense's theory was that the victim, who was in ill health, went outside, fell, and was unable to return to the house. In support of that theory, trial counsel retained a forensic expert who stated that the victim's injuries were the result of hypothermia, not blunt force trauma.

Trial counsel acknowledged that the victim made a "dying declaration" implicating the Petitioner as one of his assailants. Trial counsel argued to the jury that because of the victim's ill health and his injuries, he was not "a reliable witness as to what happened to him . . . [and] was not competent to give a reliable, credible statement."

Trial counsel said that he normally prepared his clients to testify by conducting a "mock direct examination" and "mock cross examination," and he thought he had followed this practice when preparing the Petitioner to testify. The final decision regarding whether the Petitioner would testify was made after the State concluded its case-in-chief. Trial counsel knew the Petitioner had some prior convictions that could be used for impeachment; however, she had always been adamant and consistent about what happened, and after hearing the State's proof trial counsel thought it was important for the Petitioner to testify to convey her version of events to the jury. Trial counsel said that he would not have had a client in a felony murder case testify without preparing the client for the questions he intended to ask. Trial counsel acknowledged that he "did not think [the Petitioner] made a particularly good witness" and asserted that she blamed him for her failure as a witness. Trial counsel acknowledged that he was surprised to learn that he had not asked the Petitioner "the ultimate question" of whether she killed the victim. He noted, however, that he knew such a question had "been objected to in the past." Trial counsel said that his questioning of the Petitioner was designed to directly discredit the victim's statements. Trial counsel acknowledged that he did not make any objections during the State's cross-examination of the Petitioner but said that was not unusual.

Trial counsel stated that he chose not to introduce all of the messages the Petitioner left on the victim's answering machine because he thought the "little birdy" nursery rhyme the Petitioner sang mentioned falling, and the message "appeared to be staged." Trial counsel tried to show the jury that the Petitioner and the victim had a "mutually beneficial relationship." Notably, the victim was a lonely, elderly man who had health problems and lived in an isolated part of the county. The Petitioner was his friend and assisted him.

Trial counsel did not recall having discussions with the Petitioner about any possible suspects who might want to hurt the victim or steal from him. Trial counsel did not recall having much discussion with the Petitioner about the victim's bookie or gambling problem, and the victim's gambling was not part of the defense theory of the case. Additionally, because the police found no evidence that anything had been taken from the victim's house, the main issue was "what happened to him? How did he end up in the yard?"

Trial counsel stated he was not "overly concerned" when co-counsel's health forced him to leave during trial, and trial counsel never considered requesting a continuance. Trial counsel noted that co-counsel did not have a lot of trial experience and had no prior experience trying a homicide case; nevertheless, co-counsel was "[v]ery capable," and trial counsel wanted him involved in a homicide case. Trial counsel said that he was prepared to question the critical witnesses and that co-counsel had questioned all of the witnesses he was to examine before he got sick.

Trial counsel said that the medical examiner's testimony was a problem for the defense. The medical examiner concluded that the victim's injuries resulted from blunt force trauma, not frostbite. Trial counsel said that the medical examiner's testimony was not entirely inconsistent with the defense theory of frostbite.

Trial counsel acknowledged that during the Petitioner's trial, the medical examiner said that she had seen a recording of the victim's statement prior to rendering her medical opinion. However, no such recording existed. Trial counsel did not think that testimony would justify a new trial because her medical opinion was based on more than the recording. Moreover, trial counsel thought he adequately cross-examined the medical examiner and managed to show the jury that she had confused the Petitioner's case with another case. Trial counsel did not attend Bryson's trial and did not know whether the medical examiner's testimony was consistent with her testimony at the Petitioner's trial.

On cross-examination, trial counsel said that he had been a public defender for approximately thirty years and had tried dozens of homicide cases. He talked with the Petitioner about the case on multiple occasions, provided her a copy of discovery,

explained the State's theory of the case, and discussed a possible plea agreement. Trial counsel and the Petitioner agreed that the victim must have fallen accidentally and died as a result of exposure. Trial counsel did not recall having any disagreements with the Petitioner regarding how to try the case.

Trial counsel said that the Petitioner was a good client and that she adamantly maintained her innocence. Even though the evidence against the Petitioner was not strong, trial counsel was concerned about the victim's dying declaration and the witnesses who testified about the Petitioner's incriminating statements. Trial counsel said that the Petitioner needed to testify to counter the victim's dying declaration. Trial counsel asserted that he prepared the Petitioner to testify and discussed the questions that might be asked.

Trial counsel stated that the jury's dissatisfaction with the Petitioner's testimony may not have concerned what she said but how she said it. Trial counsel did not recall the prosecutor "just running over" the Petitioner or asking many questions that were not anticipated. Trial counsel thought he made appropriate objections at trial and noted that making "hyper-technical" or insignificant objections could have been detrimental.

Trial counsel said that he had never represented Lewis. He had represented Millsaps, and he disclosed that to the Petitioner. Trial counsel thought that if any conflict existed, it had to be waived by Millsaps, not the Petitioner. He noted that Millsaps' prior charges were not related to the Petitioner's charges. Moreover, he opined that Millsaps' testimony was not significant.

Trial counsel said that he did not know whether the medical examiner's testimony that she had seen a recording of the victim's statement had any impact on the Petitioner's trial. Although trial counsel did not attend Bryson's trial, trial counsel "was informed" that the medical examiner acknowledged during Bryson's trial that no recording of the victim's statement existed. Nevertheless, the case against Bryson was weaker than the case against the Petitioner because the Petitioner had a relationship with the victim, and the victim identified her as an assailant in his dying declaration. Trial counsel stated, "The focus always was on [the Petitioner], in my opinion, looking at the proof and not this other person that supposedly was there."

Trial counsel said that his medical expert, Dr. Ronald Wright, disputed the medical examiner's findings and testified that he did not see evidence of assault or blunt force trauma on the victim's body. He attributed the discoloration on the victim's body to frostbite or "other explanations . . . other than assaultive behavior."

Trial counsel said that the Petitioner's case was "not the strongest homicide case" he had seen "but [that] there was strong evidence." In his view, the State's strongest

evidence against the Petitioner was the victim's dying declaration, followed by the medical examiner's testimony that the victim's injuries were the result of blunt force trauma. Trial counsel noted also that the Petitioner had a relationship with the victim, she was at the scene in the victim's vehicle, and State's witnesses had testified about incriminating statements the Petitioner had made. Trial counsel conceded, "I'm not so arrogant to think I couldn't have tried a better case. It was a hard case. I can't attribute the result on [the Petitioner's] not being prepared. I thought she adequately answered the questions from both me and the State. It's just obviously, the Jury didn't believe her."

Trial counsel said that he made a strategic decision to introduce all of the victim's statements to show that the victim had made other statements that were not consistent with his dying declaration. Trial counsel asserted that, even in hindsight, he would not change the defense theory.

On redirect examination, trial counsel said that juries decide cases based not only on a witness's testimony but also the witness's attitude, demeanor, and dress. He said that his practice was to prepare, not "coach," his clients. He thought that the Petitioner was an "okay" witness but that the jury did not find her or the defense theory believable. Trial counsel had not "worried about [the Petitioner's] testimony. [He] was worried about other evidence more."

The post-conviction court found that the Petitioner failed to prove that trial counsel was ineffective and denied the petition for post-conviction relief. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction

court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner contends that her trial counsel was ineffective in multiple ways. We will address each in turn.

The Petitioner contends that trial counsel failed to request a continuance after co-counsel's illness rendered him unable to continue with trial. The post-conviction court found that trial counsel was more experienced than co-counsel and that he was prepared to handle the Petitioner's trial without co-counsel's assistance. The post-conviction court found that, accordingly, the Petitioner was not prejudiced by trial counsel's failure to request a continuance after co-counsel became ill. The evidence does not preponderate against this finding. The Petitioner is not entitled to relief in this regard.

The Petitioner contends that trial counsel should have asked her about why she was upset the police would not let her keep the victim's car. The post-conviction court found that although the Petitioner's motives for wanting to keep the victim's car were not explored at trial, she had testified that her last words to the victim were a promise to visit him in the hospital. Therefore, the post-conviction court found that the Petitioner suffered no prejudice by trial counsel's failure to explore this issue further. The evidence

- 13 -

does not preponderate against this finding. The Petitioner is not entitled to relief in this regard.

Next, the Petitioner contends that she had an inadequate number of meetings with trial counsel and that her "limited interaction" with trial counsel "rendered her a mere bystander rather than an active participant in her own defense." The post-conviction court accredited trial counsel's testimony that he met with the Petitioner for "significant periods of time on at least five occasions during the pendency of [the] Petitioner's case." The post-conviction court also found that trial counsel had a "strong understanding" of the facts of the Petitioner's case and that he "spent a good amount of time over and above his meetings with [her] learning about the facts and interviewing and preparing both for cross examination of the State's witnesses and for [the defense's] witnesses." The evidence does not preponderate against these findings. The Petitioner is not entitled to relief in this regard.

The Petitioner complains that trial counsel or the public defender's office had represented "several of the potential witnesses against her" and that he had a conflict of interest that impacted her case. This court previously has explained:

> Prejudice is presumed in cases in which a petitioner can establish that trial counsel "'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected [counsel's] performance.'" Strickland, 466 U.S. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). "[A]n actual conflict of interest includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free from compromising interests and loyalties." State v. White, 114 S.W.3d 469, 476 (Tenn. 2003) (citations omitted). "The proper focus is solely upon whether counsel's conflict affected counsel's actions." Netters v. State, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997).

James Patrick Stout v. State, No. W2011-00277-CCA-R3-PD, 2012 WL 3612530, at *57 (Tenn. Crim. App. at Jackson, Aug. 23, 2012). "[U]nless the Petitioner proves that trial counsel was burdened by an actual conflict of interest, [s]he must establish that trial counsel's performance was deficient and that [s]he was prejudiced by this deficiency." Richard Frank D'Antonio v. State, No. M2011-01378-CCA-R3-PC, 2012 WL 2411871, at *15 (Tenn. Crim. App. at Nashville, June 27, 2012).

The post-conviction court accredited trial counsel's testimony that the only potential conflict of interest existed with Millsaps, that trial counsel's representation of

- 14 -

Millsaps occurred "a significant period of time from when [trial counsel] represented [the Petitioner]" in a case unrelated to the Petitioner's case, and that trial counsel had discussed the representation with the Petitioner. The post-conviction court found that "that this conflict only prejudiced Millsaps," and that the potential conflict did not affect trial counsel's representation of the Petitioner. The post-conviction court also found that Millsaps' testimony was "helpful . . . in that she [provided] a time line"; therefore, the Petitioner suffered no prejudice. We agree. The Petitioner is not entitled to relief.

The Petitioner asserts that trial counsel should have had her sister testify regarding Lewis' reluctance to testify. The record reveals that although Lewis' sister attended the post-conviction hearing, post-conviction counsel informed the court that he did not intend to call her as a witness. Generally, "[w]hen a petitioner contends that trial counsel failed to . . . present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We may not speculate on what benefit this witness might have offered to the Petitioner's case. Id. Accordingly, the Petitioner has failed to demonstrate prejudice in this regard.

The Petitioner contends that trial counsel failed to prepare her to testify and complains that the decision for her to testify was made at the "last minute." Trial counsel explained that after hearing the State's proof, he thought the Petitioner needed to testify so the jury could hear how much she cared about the victim. Trial counsel also explained that it was not unusual to wait until the State's proof was concluded to make the decision whether the accused should testify.

The Petitioner also contends that trial counsel should have asked whether she killed the victim. The post-conviction court accredited trial counsel's testimony that the Petitioner was prepared to testify at trial. The post-conviction court found that even though trial counsel did not ask the Petitioner the "ultimate question" of whether she killed the victim, "the only conclusion that can be drawn from all of [the Petitioner's] testimony is, that [the Petitioner] did not kill that man." The post-conviction court also found that the Petitioner was given an opportunity to tell the jury her "side of the case." The post-conviction court noted "that [the] Petitioner's complaint that she did not do as well on cross-examination as she had hoped is a grievance shared by countless defendants over the years, and one that doubtlessly has more to do with the abilities of a talented prosecutor than the deficiencies of [trial] counsel." The evidence does not preponderate against the findings of the post-conviction court. The Petitioner is not entitled to relief.

The Petitioner also asserts that trial counsel should have objected during the State's cross-examination of her. The post-conviction court noted that the Petitioner did not state specifically anything to which trial counsel should have objected. See Michael

- 15 -

Webster v. State, No. M2014-02019-CCA-R3-PC, 2015 WL 9412755, at *7 (Tenn. Crim. App. at Nashville, Dec. 22, 2015). The post-conviction court also agreed with trial counsel's testimony "that sometimes Attorneys choose not to object so as not to alienate a Jury with too many [objections]." The Petitioner is not entitled to relief.

Finally, the Petitioner contends that trial counsel failed to confront the medical examiner about her testimony that she had watched a video that did not exist. As the post-conviction court noted, the medical examiner testified that she thought she looked at the recording but was not certain. Additionally, the post-conviction court found that the jury had ample evidence that the medical examiner's medical opinion was based upon her examination of the victim, her review of the victim's medical records, and her discussions with the police. The post-conviction court found that trial counsel was not deficient and that, regardless, the Petitioner suffered no prejudice. We agree. The Petitioner is not entitled to relief.

### III.  Conclusion

The judgment of the post-conviction court is affirmed.

_____
NORMA MCGEE OGLE, JUDGE

- 16 -